Filed 6/25/13  P. v. Rodriguez CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>FIDEL RODRIGUEZ,<br><br>    Defendant and Appellant. | A135640<br><br>(San Mateo County<br>Super. Ct. No. SC074543A) |

## I. INTRODUCTION

In December 2011, appellant was convicted by a jury of committing a lewd and lascivious act upon a child under the age of 14, Jane Doe, then eight-years old.  The trial court suspended imposition of sentence and placed appellant on three years probation.  Claiming that the trial court erred in admitting evidence from a witness concerning appellant's wife's statements to that witness, appellant asks that his conviction be set aside.  We disagree with his contentions and hence affirm his conviction.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On November 7, 2011, an information was filed charging appellant with violating Penal Code section 288, subdivision (a), committing a lewd and lascivious act upon a child under the age of 14.  Appellant was tried before a San Mateo jury on December 14 and 15, 2011.  The following is a summary of the evidence presented to that jury.

In 2011, appellant and his wife shared a house in San Bruno, San Mateo County, with several other people, including a woman named R. C. (hereafter R.) and her three children.  Those three children were T., age 16, Jonathan, age 10, and the alleged victim

in the case, Jane Doe, age 8.  Jane had clear developmental problems, and was described by her mother as being "delayed" in her development, using medication on a daily basis, and having epileptic seizures.  The mother also described Jane as usually functioning between the ages of two and four years.  T. and Jonathan watched over Jane when their mother, R., was working (at a nearby Laundromat).

On the afternoon of July 26, 2011, R. was working and her three children were at their home.  The oldest, T., was watching over the younger two, Jonathan and Jane, while all three were in their family's bedroom.  Jane then left that room and went into the living room of the house.  T. asked her younger brother, Jonathan, to "go get her," and Jonathan went into the living room, also then occupied by appellant, and he and Jane began watching some birds kept in birdcages there.

Appellant, then 68 years old, was sitting in a wicker chair in the living room and Jane "was standing up . . . [n]ext to him."  Appellant asked Jonathan to cover a birdcage—apparently belonging to him—about 10 or 15 feet away from where appellant was sitting.  Jonathan did so, but then turned around to see appellant pull Jane towards him and put "his hand in my sister's pants" for about five seconds.  Jane told appellant to "stop," appellant saw Jonathan watching him, and he then pushed Jane away.  Without saying anything, appellant then "just walked out of the room after that."

Jonathan and Jane then returned to the bedroom they shared; Jonathan told T. (again, the oldest of the three) that "the guy" had touched Jane.  T. asked her sister where she had been touched, and Jane "gestured down in her private part and . . . just said here."  T. then called their mother, R., told her what had happened, and R. came home five minutes later.  Jonathan told her what had happened, and she was then "like in shock."  R. also noticed that Jane seemed "[v]ery serious.  Very different."

R. then took Jonathan into her bedroom and asked him what had happened; he responded that appellant had "placed his hand inside [Jane's] underwear" and "[i]nside the panties."

A little bit later, after R. had gone back to her workplace and arranged to return home, she asked Jane to tell her what had happened.  Jane then "placed one hand over her

2

face and lowered her face down," a very unusual action for Jane when she was with her mother. When R. pulled down Jane's panties to check her vagina, Jane said "ouch," a word she normally used to indicate pain. Jonathan then repeated to his mother what he had seen appellant do in the living room; R. called the police and then went to see appellant's wife, who was in the kitchen at the time.

After the wife had heard from R. what the latter had learned from her children, the wife brought appellant out from their bedroom into the shared living room. On direct examination, R. testified that, when he came into the living room, appellant appeared "nervous" and his hands were "shaking." After he came into the room, R. continued, she asked Jane "what did this man do to you," and her daughter responded by placing one hand "over her face" and the other "in between her legs."

On cross-examination by defense counsel, R. testified that appellant "told me that boy [Jonathan] is lying." Defense counsel then asked her if appellant had said anything specific "about lying . . . or was he just saying that in general?" R. responded: "When his wife brought him to the room she was . . . standing right next to him. And she told him, 'I warned you that I didn't want this type of problems' " and " 'I warned you to respect them because she is a mother, a single mother with children and she needs to be respected.' And that is when he said, 'He's lying. The boy is lying.' "[1]

At this point, appellant, his wife, R., and both Jane and Jonathan were in the living room of their shared house; Jane was sitting between her mother's legs. R. asked Jane what appellant had done to her, and Jane put one of her hands in front of her genital area and the other in front of her face, and in doing so was "very serious" in her demeanor, as was Jonathan who was also present. Appellant claimed that "he was not the one that did it. But his voice was shaking" and he "could barely hold onto his cane."

---

[1] As discussed further below, defense objected to this testimony and asked the court to strike it, which the court declined to do although specifically stating that the "statements should be considered by the jury not for the truth of what they are but just to set up the answer of the defendant."

Shortly thereafter, the police arrived. One of the several officers who responded, Officer Mike Blundell, interviewed Jonathan; the latter told him that appellant had touched his sister, Jane Doe, "around her groin area."[2] This statement led the officer to interview Jonathan more fully and privately; he found Jonathan to be more "intelligent than, and articulate in regards to other kids that I have questioned at that age and/or spoken with." In his continued, 20-minute or so interview with Jonathan, the latter reiterated that, when he had heard his sister say "stop," he turned around and "saw the defendant's right hand on the interior portion of his sister's sweat type pants. . . . [¶] . . . in and around her groin area." Blundell scanned and photographed the room where the incident took place, and concluded that Jonathan could have "a direct view to what the defendant was doing to his sister."

Later, another San Bruno police officer, Detective Heidi Schindel, interviewed Jonathan. He told her essentially the same thing, i.e., that after he heard Jane say "stop," he turned around and "saw that the defendant had his hand underneath her pants touching her private area," and that he was certain that appellant's hand "was underneath the pants." Jonathan also reiterated to Detective Schindel that, when appellant noticed that Jonathan was watching him, "he immediately kind of moved the sister and left the room."

Earlier in its case, the prosecution had introduced testimony from a San Mateo County Sheriff's Department criminologist that a person who touches another person's hand "for several seconds" might or might not leave DNA on the latter surface depending on a variety of factors, including the amount of DNA present on each hand, which person is "a better shedder," and whether the touched person had washed his or her hands after the touching. After the conclusion of the prosecution's case, and before the beginning of the defense case, the parties stipulated that none of Jane's DNA was found on appellant's hands and that a medical examination of Jane revealed no indication of trauma or penetration in her genital area.

---

[2] None of the evidence summarized hereafter is mentioned in the Attorney-General's brief to us. We find this rather curious, because much of it is actually helpful to their position in this appeal.

4

Appellant, as noted then age 68, testified in his own defense. He testified that he and his wife had had six children, all of them daughters. At the time of the event in question, he and his wife were living in a house owned by one of those daughters and her husband. Other rooms in the house—as noted above—were rented out to others, although all the tenants shared the living room and kitchen. R. and her three children had lived in the house for about two months.

On the day in question, July 26, 2011, appellant testified that he had come into the sitting room and was apparently both "watching the birds and covering them up" when the two children, Jonathan and Jane, entered the room moments later. Jane was, per appellant, wearing a T-shirt and sweat pants. The two children were, according to him, "looking at the birds" and, in the process, Jane had removed the cover from one of the bird cages. Appellant asked Jonathan to replace it and, as he did so, Jane was standing "close by" to him. Appellant testified that he was concerned Jane might step on his sore foot. He thus got up and left the room and, in so doing, placed his hands "along her waist" on the outside of her pants, whereupon Jane uttered the word "stop." Although appellant admitted physically moving Jane, he denied touching her at all below the waist. Before the police arrived, appellant had said the same thing to Jane's mother, R., i.e., telling her "nothing happened."

About five minutes after he had gone back into his room, the police arrived. Early the following morning, he was tested for DNA; he claimed he had not washed his hands in the intervening period.

Two of appellant's daughters testified in appellant's defense; both stated that they had never known appellant to act in a sexually inappropriate manner with either them or their children.

As noted above, R. testified—during cross-examination by defense counsel—that, in the course of the events of July 26, appellant's wife made, in her presence, two statements to him reminding him of her earlier alleged "warnings" to him about "this type of problems." Defense counsel objected on the basis that the alleged statements of the wife were "irrelevant" and "hearsay" and asked that they be stricken. The trial court

5

denied the request, stating: "The wife's statements should be considered by the jury not for the truth of what they are, but just to set up the answer of the defendant. It's kind of a legal distinction. But you should only consider the wife's comments as they put the defendant's statement in context, not for the statement the wife may or may not have said herself."

Nothing further was said on this subject, and defense counsel then proceeded with further cross-examination of R. This specific testimony of R. was not mentioned in either closing argument to the jury.[3]

However, a short time after the jury began its deliberations on December 16, 2011, it delivered several hand-written questions to the court. They read: "We need clarification of the mother's testimony about what the defendant's wife said to the defendant. The mother was talking with the defendant and his wife before the police arrived. The mother said the wife spoke to her husband, the defendant. An attorney objected, the judge gave the jury instructions. 1. What are the judge's instructions? 2. Is the wife's statements as repeated by the mother admissible? 3. If admissible, what did she say?"

The trial court responded by informing the jury, in writing: "The Court reporter will read the exchange of testimony and the Court's remarks at that time." It also advised the jury to re-read "instruction 303" (i.e., CALCRIM No. 303), an instruction regarding the limited purpose of certain evidence.

As instructed, the court reporter then re-read to the jury the relevant portion of R.'s testimony, and the immediately-following admonishment the court gave the jury with respect to this testimony. Shortly thereafter, the jury returned its verdict finding appellant guilty of the single charged offense.

---

[3] In her closing arguments to the jury, the prosecutor stressed, indeed often, the testimony of Jonathan and what he had seen, labeling him as "the most important witness in this entire trial." R. was mentioned only briefly by the prosecutor, and only with regard to her after-the-incident caring attitude toward her three children.

After that verdict had been entered, on April 9, 2012, new defense counsel filed a motion for a new trial. In it, he argued—among other things[4]—that the trial court erred in not striking the answer given by R. The trial court denied that motion on May 9, 2012, stating: "The Court disagrees there was an error of law in admitting hearsay statements attributable to the Defendant's wife. The statements were admitted for the non-hearsay purpose of giving meaning to the subsequent comment by the defendant and the jury was so instructed."

On May 25, 2012, the trial court suspended imposition of sentence and placed appellant on probation for three years.

On May 30, 2012, appellant filed a timely notice of appeal.

### III. DISCUSSION

In his briefs to us, appellant asserts that the trial court abused its discretion and violated his constitutional rights by admitting the testimony of R. regarding appellant's wife's statements to him on the day in question. He contends that the wife's statements were inadmissible because they were irrelevant and consisted of hearsay. He continues that, although the trial court was correct in finding "that appellant's wife's statements were inadmissible hearsay if offered for the truth of the matter asserted, the trial court erred in permitting the statements to be introduced for the nonhearsay purpose of 'set[ting] up the answer of the defendant.' " Because of the "prejudicial impact of the evidence . . . no limiting instruction could have cured the prejudice" caused by their admission, thus violating appellant's constitutional rights under the Fifth, Sixth, and Fourteenth Amendments to the federal Constitution. He further contends that no trial court error can be deemed harmless because "the record clearly indicates the jury was specifically focused on the statements and was considering them during their deliberations . . . ."

---

[4] More extensively, that counsel also argued ineffective assistance of trial counsel in several alleged respects.

We disagree.  For a variety of reasons, we find no error in the trial court's refusal to strike the one specific answer of witness R. Cruz adduced on cross-examination, particularly in light of the specific instruction it gave the jury immediately after defense counsel's objection and motion to strike, and then repeated to the jury during its deliberations.

First of all, an evidentiary ruling of the sort at issue here is clearly reviewed under an abuse of discretion standard of review.  Thus, both the issues of relevance and the treatment of hearsay testimony are governed by that standard.  (See, e.g., *People v. Riccardi* (2012) 54 Cal.4th 758, 815; *People v. Jablonski* (2006) 37 Cal.4th 774, 821; *People v. Turner* (1994) 8 Cal.4th 137, 189 (*Turner*) overruled on different grounds in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5; *People v. Rowland* (1992) 4 Cal.4th 238, 264.)  "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it."  (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

Second, appellant has clearly forfeited any grounds other than hearsay and relevance to justify the exclusion of the testimony of R. regarding the answer given by appellant's wife.  At trial, appellant's counsel—the one who framed the question to R.— moved to strike her answer only on the grounds that "it goes beyond the scope of the question, it's irrelevant, it's hearsay."  Nothing was mentioned regarding the issues now raised in appellant's briefs to us regarding Evidence Code section 352 or any of the several constitutional issues argued therein.   Indeed, even in the post-trial motion—filed in the trial court by different defense counsel—no constitutional issues were raised or even mentioned.  Under well-established law, appellant may not now contend, as he does in his briefs to us, that the trial court violated any of his constitutional rights in its denial of his motion to strike R.'s answer to his counsel's question to her.

In *People v. Partida* (2005) 37 Cal.4th 428 (*Partida*), our Supreme Court explained:  "The objection requirement is necessary in criminal cases because a 'contrary rule would deprive the People of the opportunity to cure the defect at trial and would "permit the defendant to gamble on an acquittal at his trial secure in the knowledge that a

conviction would be reversed on appeal." ' [Citation.] 'The reason for the requirement is manifest: a specifically grounded objection to a defined body of evidence serves to prevent error. It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice. It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal.' [Citation.] [¶] Thus, the requirement of a specific objection serves important purposes. . . . [¶] In this case, defendant objected at trial that the gang evidence should be excluded under Evidence Code section 352. The objection alerted the court to the nature of the anticipated evidence and the basis on which its exclusion was sought. It permitted the court to make an informed ruling and gave the People the opportunity to establish the evidence's admissibility. On appeal, defendant may argue that the court erred in its ruling. But he may not argue that the court should have excluded the evidence for a reason different from his trial objection. If he had believed at trial, for example, that the trial court should engage in some sort of due process analysis that was different from the Evidence Code section 352 analysis, he could have, and should have, made this clear as part of his trial objection. He did not do so. Accordingly, he may not argue on appeal that due process required exclusion of the evidence for reasons other than those articulated in his Evidence Code section 352 argument." (*Partida, supra,* 37 Cal.4th at pp. 434-435.)

Evidence Code section 353, subdivision (a)—a statute not cited or discussed in either of appellants' briefs to us—makes this point quite clear. It provides: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear *the specific ground of the objection or motion . . . .*" (Evid. Code, § 353, subd. (a), emphasis supplied; see, applying this statute, *People v.*

9

*Abel* (2012) 53 Cal.4th 891, 924, and *People v. Kennedy* (2005) 36 Cal.4th 595, 612, overruled in part on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459.) [5]

Even if there was no forfeiture, appellant's argument that the admission of that particular testimony of R. was prejudicial error fails. In his briefs to us, appellant argues that if there was any such forfeiture (1) his trial counsel was ineffective and (2) his federal constitutional rights were violated by the trial court's refusal to strike the answer of R. regarding appellant's wife's statement to appellant when she came into the sitting room. We disagree with both contentions.

Regarding the alleged ineffective assistance of counsel, our Supreme Court has made clear that a significant burden exists to sustain such a contention on appeal. As that court held in *People v. Farnam* (2002) 28 Cal.4th 107, 201: "To prevail on such contentions, defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different." This holding is, of course, consistent with that of the United States Supreme Court which, in the leading case of *Strickland v. Washington* (1984) 466 U.S. 668, made clear that "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment" (*id.* at p. 690) and, further, that a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at p. 694; see also *People v. Castaneda* (2011) 51 Cal.4th 1292, 1335.)

---

[5] In a post-trial motion, appellant's second trial counsel briefly mentioned Evidence Code section 352 in contending that the wife's comments had little if any probative value at the trial, and that any such value was outweighed by possible prejudice. But, as the *Partida* court made clear, "the admission of evidence, even if error under state law, violates due process only if it makes the trial fundamentally unfair," i.e., "a very narrow due process argument on appeal." (*Partida, supra,* 37 Cal.4th at pp. 435, 436, 439.) For the other reasons discussed herein, especially the trial court's twice-repeated cautionary instruction to the jury, such was not the case here.

Under these standards, there was no ineffective assistance of trial counsel in this case regarding the testimony—again, testimony adduced on cross-examination—of R. regarding appellant's wife's statements to him in the jointly-shared living room. The hearsay and relevance objections asserted by that counsel were clearly the most apparent and obvious ones for him to make under the circumstances. There is no authority that we are aware of, and indeed none is cited in appellant's briefs to us, that holds or even suggests that defense counsel is required to assert "all permissible grounds" of objections to evidence which is adduced. Thus, there was no reasonable likelihood that the trial court would have granted defense counsel's motion to strike the objected-to testimony of R. even if further specific objections regarding appellant's wife's statements to him, i.e., objections based on constitutional grounds, had been articulated.

Further, it is not at all likely that the jury verdict would have been different even if any such motion to strike was granted. As noted above, the jury had before it both the specific testimony of Jane's brother Jonathan as to what he had seen and T.'s testimony about what Jane had both said and demonstrated to her. As noted above, it also had heard the prosecutor's argument that the most important testimony it had heard was that of Jonathan. And, finally, it had the court's twice-repeated instruction that it should not consider the wife's alleged statements "for the truth of what they are, but just to set up the answer of the defendant."

Finally regarding the constitutional arguments appellant makes in his briefs to us, even if such arguments were not forfeited at trial, they cannot and do not change the outcome here. As our Supreme Court has made clear, indeed several times: "Application of the ordinary rules of evidence generally does not impermissibly infringe on a capital defendant's constitutional rights." (*People v. Kraft* (2000) 23 Cal.4th 978, 1035; *People v. Prince* (2007) 40 Cal.4th 1179, 1229; see also *People v. Riggs* (2008) 44 Cal.4th 248, 304 ["To the extent defendant's claim is a constitutional gloss on his trial objection and therefore not forfeited, it is without merit because there was no abuse of discretion."].)

Most importantly regarding the claimed error of the trial court, as noted above it *twice* instructed the jury that: "The wife's statements should be considered by the jury not

11

for the truth of what they are, but just to set up the answer of the defendant.  It's kind of a legal distinction.  But you should only consider the wife's comments as they put the defendant's statement in context, not for the statement the wife may or may not have said herself."

The law is very clear that  "[w]e presume that the jury followed the court's instructions."  (*Turner, supra,* 8 Cal.4th at p. 190; see also cases cited therein and, additionally, *People v. Richardson* (2008) 43 Cal.4th 959, 1004; *People v. Davis* (2005) 36 Cal.4th 510, 537.)  Very recently, our Supreme Court reaffirmed this rule; it stated: "We reject as entirely speculative defendant's assertion that these limiting instructions were inadequate.  'Any prejudice that the challenged information may have threatened must be deemed to have been prevented by the court's limiting instruction to the jury. We presume that jurors comprehend and accept the court's directions. [Citation.]  We can, of course, do nothing else.  The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions.'  [Citation.]"  (*People v. Homick* (2012) 55 Cal.4th 816, 866-867.)  These repeated and clear holdings of our Supreme Court thus undermine appellant's argument that "no admonition or instruction could undo the prejudice associated with the statements."

Consistent with this principle, we must and do conclude that the jury both understood and followed the trial court's twice-repeated instruction that it *not* consider R.'s testimony regarding appellant's wife's statements in her presence for the truth of any matter asserted therein.

Finally, there is one more reason there was no prejudicial error in the court's ruling regarding the challenged testimony of R.  It is because the testimony of R. on cross-examination was the direct result of defense counsel's probing deeper into the events of July 26 than had the prosecutor in her direct examination of R.  Further, inasmuch as R. was the first witness for the prosecution, the jury had not yet heard from Jonathan about what he had seen and the reactions of, first, Jane Doe, to the alleged touching and, second, the "lying" response of appellant to Jonathan's version of the

12

events of that day. Thus, on direct examination, R. simply testified that (1) Jane often used the term "ouch" whenever "she's in pain for whatever reason" and (2) appellant responded to her questions to him as to what had happened by saying—in a "shaking" voice "that he was not the one that did it."

On cross-examination, defense counsel opted to pursue both those points, and cross-examined R. first with regard to when and under what circumstances Jane would say "ouch" (3 RT 57-59) and then regarding what appellant had said about the incident. In the course of the latter cross-examination, defense counsel asked R.: "When you were in the same room with Mr. Rodriguez I think you said that he told you that your son was mistaken; am I right about that?"

R. answered: "Lies. He told me that boy is lying."

Defense counsel followed up on this answer by asking: "Did Mr. Rodriguez explain further his statement that he believed your son was lying?" R. responded: "No. He just said he's lying." There then followed the question from defense counsel and the answer from R., quoted above, that forms the basis for this appeal, i.e., concerning the statements of appellant's wife in front of her and appellant.

What all this strongly suggests is that the question posed to R. on cross-examination by defense counsel was intended to put in context what *appellant* knew at that moment concerning the accusations against him. Put another way, R.'s testimony concerning the statements of appellant's wife explained both appellant's understanding of what he had in fact done *and* his accusations that the one eye-witness to his acts, i.e., Jonathan, "was lying."

As our Supreme Court explained in *Turner*, providing context to a defendant's statements is a permissible purpose validating the admission of testimony which would otherwise be inadmissible as hearsay. The *Turner* court explained: "An out-of-court statement is properly admitted if a non-hearsay purpose for admitting the statement is identified, and the non-hearsay purpose is relevant to an issue in dispute." (*Turner, supra,* 8 Cal.4th at p. 189.) As here, the statements at issue in *Turner* "gave context and meaning to defendant's admissions." (*Id.* at p. 190.) Further, and as noted above, here as

13

in *Turner* "the jury was repeatedly instructed that they were not to consider [the witness's] statements for the truth of the matter asserted, but merely to give context to defendant's statements. We presume that the jury followed the court's instructions." (*Ibid.*) For this reason, also, the trial court did not err in declining to strike R.'s testimony concerning appellant's wife statements to him, statements made in R.'s presence.

For all of these reasons, we reject appellant's argument that the trial court's denial of its motion to strike the testimony of R. regarding appellant's wife's statements constituted prejudicial error.

## IV. DISPOSITION

The judgment of conviction is affirmed.

_____
Haerle, J.

We concur:

_____
Kline, P.J.

_____
Lambden, J.